Services. This is an appeal from a decision by a special master appointed under the Vaccine Act, where the special master denied benefits to the claimants. Mr. Krakow, you want four minutes for rebuttal? Yes. All right. You may proceed. Thank you, Your Honor. Robert Krakow for Petitioners Marik and Yolanta Milik. May it please the Court. We're here because 18 years ago, Arthur Milik received an MMR vaccine. 19 days later, he began limping. Prior to receiving the MMR vaccine, the record shows that he was perfectly healthy. There is absolutely nothing in the contemporaneous pediatric record showing otherwise. Notwithstanding... The special master raised this issue, and it was a thoughtful one, but is there really... is this one disease mechanism that the doctors are referring to? In other words, are the physical and mental components tied together because it's one brain misfiring? I don't think the record clarifies that. I'm not sure medical science clarifies that. What we know is that there was a diagnosis of Arthur Milik of spastic diplegia, a motor disorder. Today, he's in a wheelchair. He speaks and understands both Polish and English today, and that's in the record. What he can't do is take care of himself and walk and do the things people would do. There are some not well-defined cognitive problems that he had. Those cognitive problems did not appear prior to the MMR vaccine. Mr. Greco, you raise an arbitrary or capricious argument, arguing that the Vaccine Act is unconstitutional, and you cite to Article 3 of the Constitution, but you don't identify which clause of Article 3 or which rights in that article guarantee your right to do a no-vote review. Could you give us some help here? Sure. We're relying in part on a recent Supreme Court case, Stern v. Marshall, which discussed the consideration of claims that were traditionally brought to common law, like a products liability claim or a vaccine injury claim, that are now being adjudicated through alternative courts under the Vaccine Act, as we have in the Vaccine Injury Compensation Program. Under the original understanding of the Act, there was an opportunity for a petitioner to reject a judgment in the vaccine court or elect to proceed in a state or federal court under common law or under state statutes. That is now gone. We submit that a litigant bringing these kinds of claims is entitled to a no-vote review in an Article 3 court, as it traditionally would be available. So you're saying Stern v. Marshall says that you can't be deprived of the right to an Article 3 court? That's right. That has been limited in a follow-up case in 2015 by a case called Wellness International. However, that involved a case where the parties consented to jurisdiction. That has not happened here. There was no place then or now for Arthur Millick to bring his claim, other than the vaccine injury compensation. Did he bring the claim before or after the Supreme Court said that there... Well, before. He brought the claim in 2001. The injury was in 1998. So once the Supreme Court, Justice Scalia, I think, issued its decision saying that these claims were largely preempted, then at that point you were already before the vaccine court. Yes. And even prior to that decision, we would have had the opportunity to reject the judgment in the vaccine court and proceed in a state or federal court, alleging products liability claim, design defect, or other basis. Now the only claim we would have... So I'm a little confused. So prior to this preemption decision, you think the vaccine court system was constitutional because you could elect to go to state or federal court? Our argument would... We would have made the argument then. However, the landscape changed when Bruisewitz was decided. So it made our argument stronger and more viable. Well, let's just assume it was constitutional before Bruisewitz. You think that the Supreme Court, when it decided this preemption thing, made the entire system unconstitutional? I mean, the Supreme Court was clearly aware of the whole vaccine compensation system, wasn't it? The issue of the constitutionality on the grounds that we're arguing was not before the court. No, I understand that. That wasn't the issue. It was a preemption issue, but certainly they were aware of the vaccine court system. That's the basis of the preemption. Absolutely. Do you think the Supreme Court would have intended to, by its decision, to render the entire system unconstitutional? I don't know whether or not Justice Scalia contemplated that. I do know that there was a very well-reasoned dissent by Justice Sotomayor that discussed that it was fundamental to our system of adjudicating civil claims, tort claims in particular, that petitioners had an opportunity. The preemption issue was not discussed. The preemption issue I'm raising, the Zunova review issue that I'm raising, was not presented or discussed there. And we've never discussed it in the four years since? I couldn't find anything. I don't believe – well, there is a claims court decision, because the issue was raised, that discussed that, but I don't believe it was raised before the circuit. I mean, what about analogous contexts? I mean, there are many instances in which the Supreme Court has said that tort claims are preempted by federal regulatory systems. In those instances, such as the failure to warn claims with respect to medical devices, et cetera, are those all unconstitutional, too? Well, the statute – we would argue by analogy, yes, but we're not – that's not before the court here. The Vaccine Act, in fact, does provide FDA preemption under Sections 22 and 23, assuming the FDA approved the label. But we're talking more about design defect claims and the type of claims that you have here. We simply do not see how a fact-based, fact-intensive type of claim that is decided by a special master is entitled to the extreme deference that's being accorded when, as in this case, you see interpretations of facts that are just not supportable. And, in fact, the claims court said they were not supportable. The key interpretation by the respondent's expert of the pre-vaccine developmental delay, which may or may not have been connected to the motor problem. Don't go away from your constitutional question yet. Okay. You make an argument that your client was deprived of common law protections afforded in the state courts for torches and injuries. What specific protections in state courts or common law? I think the best way to put that – I appreciate the question. The best way to put that is if Arthur Millick went before a state or federal jury with this evidence. First of all – So you're saying right to trial by jury? Right to trial by jury, but also right to de novo review. An Article III judge reviewing that evidence and determining whether it's sufficient or not, with de novo review, would those set of rights – Why would it be de novo review of the evidence? Well, an Article III judge would have the right to do that. In an appellate court? I mean, let's say you went to a federal district court, had a jury trial on this issue. There were fact findings against you. You think the appellate court could do de novo review? No, not with a jury verdict. So we're deprived of a right to jury. We're deprived of a right to review of the evidence by a federal district court judge. I'm not arguing that appellate review would typically be de novo. This court, of course, does not have de novo review. So there is no de novo review anywhere. What we have is a special master's interpretation of the facts, and I've briefed that extensively. So you're saying it's the Court of Federal Claims that should have had de novo review over the special master's determination? Yes. Well, how does that help your argument? I mean, the Court of Federal Claims isn't in an Article III court either. Well, if there was de novo review in the Federal Claims Court, it may cure – How could that cure your constitutional argument, which is apparently based upon Article III? It seems to me the logic of your argument is you have to have de novo review by an Article III court, and the only Article III court in the chain of this compensation system is us, and we're certainly not going to do de novo review of fact findings. So I agree with that, and revising my prior statement, and I think our position to be consistent would be the Claims Court should have de novo review, but we should have an opportunity in a real sense to go before a district court, which we don't have at all now. We don't have an opportunity to go before a district court under any standard. I mean, that's what is breathtaking in the scope of your argument. If we accepted your constitutional argument, it would render almost any scheme in which the federal government enacted some kind of remedial system in non-Article III courts and had preemption unconstitutional. That's appreciated. I mean, we've had these kind of remedial schemes around for decades, if not more years. Don't you think the Supreme Court would have found that by now? I think in Stern v. Marshall they did, to a large extent, find that. I don't think the argument has been made with respect to the Vaccine Act since the Supreme Court took away any meaningful avenue to an Article III court or a common law court. But I also would like to emphasize that even if the constitutional argument was not accepted by the court, that this record under even an arbitrary, capricious, or abusive discretion review does not pass muster. All right, let's turn to that, and I'll give you a few extra minutes so that we can do that. Thank you. You opened with a pretty broad statement that said there was no evidence of any problem at all before the vaccine. Now, I concede to you that there's very little in the record of evidence of any motor problems before the vaccine. But the special master said that your claim, as well as all your experts, treated the developmental delay and the motor problems as one disease mechanism. How do you get around that? In fact, the first pediatric neurologist who saw Arthur Millick on March 3, 1998, after he started limping on February 19, 1998, said he saw two distinct problems. He did not associate the two with each other. He said, and this is a key. Yeah, I agree with that. That's a pretty clear statement that he said one was longstanding, one was acute or brand new. And there's a couple other places where some of the doctors that saw him divided the two. The problem is that you filed a claim and your experts didn't divide the two. Your experts treated them as evidence of one disease mechanism. Well, the expert didn't. The first thing a petitioner's expert did is articulate why there's nothing in the record to show pre-vaccine developmental delay in any form. So that's the first thing. The second thing is he felt the appropriate diagnosis, an appropriate way to look at Arthur's condition, was spastic diplegia, which is primarily a motor problem. I think the issue of whether a language problem relates to that is something that was injected in the case by the respondent's expert because he read into the record in a very strange way, which the claims court criticized very severely, said it was poorly supported and not supported by the record, a pre-vaccine language delay. So that's how that got injected into the case. Well, if the court found that it wasn't supported by the record, then you still have the second point, which is you've got to have something that indicates that the MMR was a trigger, right? Yes. Encephalitis? Yes. Well, PROM1 often is not an issue here. The court said we have a reliable medical theory. So the issue is the logical sequence of cause and effect and the temporal proximity. And it's probably the temporal issue that probably causes the most concern, and the court said that we didn't show that it was proximate. However, the literature, and I cited this in the Ward case, it's at the appendix, page 916, actually shows that it is a higher incidence of developmental problems from the MMR, adverse events from the MMR, 15 to 35 days out. So it is possible for it to happen. The question, it's most likely within 5 to 11 days, but it's not unlikely or it's possible after that. So I would argue, based on this court's analysis of that kind of issue in Palak, that we've met that temporality issue. There's nothing else in the record that explains it. The respondent talks about a sore throat. There's no verification that there's a sore throat. There's no explanation how a sore throat would cause this devastating injury. There is an explanation of how the MMR would cause that kind of devastating injury. And while we're talking about that, aside from a strained interpretation of the contemporaneous pediatric record pre-vaccination, what the respondent points to are two post-vaccination reviews. One is Dr. Maytel, this idea of longstanding, but he himself clarified that and said, he can't say when that happened, it was just there. And the court dismissed that as being litigation-driven when we have a paid expert for the respondent who's not being characterized as litigation-driven. Dr. Maytel has been a treating doctor for 18 years. The second thing that the special master pointed to, and also the claims court, is a psychological evaluation more than six months after the injury by a psychologist named Alan Oska. The court, the special master, read into that a finding that there was pre-vaccination developmental delay when there's nothing that can be gleaned from that analysis except that there is developmental delay at the time of the evaluation. So I would submit there's nothing in the record that credibly supports the special master's findings or, for that matter, the claims court. Well, that Dr. Malinowski's finding would be purported to be at nine months and four years of age, right? At four years and nine months of age, right? Four years and nine months, that's when she did her evaluation. So that was seven months after the vaccination. And you're saying that you don't see anything in Dr. Malinowski's findings that indicate that those two functioning problems preexisted the MMR? No, because you cannot retrospectively say that Dr. Malinowski could not say when that started or that it started before the MMR. All she can say is that there is a developmental delay at that time and maybe he was functioning six months behind or whatever, but she doesn't say when that happened. That's the time of her evaluation. I would respectfully submit... Well, she's looking back at the three-year report and the two-year report, right? I don't believe so, because if you look back at a three-year and two-year report, there's nothing there to support a conclusion. She's looking at Arthur Millick at four years and nine months and making a determination how far behind he was. She cannot say that he was behind at the age of four years. As a matter of fact, the pediatric record on the day of vaccination said Arthur Millick was doing well, speaking well. Three months before, there's also a pediatric review saying he was doing well. The respondent simply says, oh, pediatricians get it wrong all the time. I don't think that's a fair inference you can draw from the record. Simply said, the pediatricians are wrong, I'm right. Even Dr. Maytel says, I can't say when that started. I know it's here now, and also he doesn't necessarily connect the two, so how does that relate to the primary problem Arthur Millick had and has is the motor problem. So is your best argument that these are two different diseases, that perhaps he was developing slowly on a cognitive level, but that the motor skill issue was not a problem or was not identified at all before? Or is your best argument that there was no evidence of either problem before that? I think the second argument is our argument. I don't think medical science or the treating doctors or anyone else can say whether these two things were separate or not, or whether the language problem that appeared later was a result of the motor problem. That has not been clarified. I'm not respectfully sure it can be clarified, and we didn't attempt to do that. I don't think that's something that doctors can do within the limits. There was extensive testing of alternative causes, and none of the doctors at the Institute for Basic Research in New York found anything prior. They never referred to anything prior to the vaccination, and they primarily looked at the motor problem. So our argument is that there was no problem pre-vaccination that is supportable in the record, or otherwise. It just didn't exist, and it was read into the record. It was invented. It was created by the respondent's expert. Of course, the special master refers to his superior credentials. You can't decide these issues just based on credentials alone. We had a competent neurologist. He sees nothing in the evidentiary record. It's not there. Well, credentials do go to the question of credibility, and we have said special masters have the right to make credibility determinations. And here we have someone who has, I'll concede, superior credentials, who reads a record in such a way that even the claims court says it's unsupportable, not worthy of support, not worthy. And those are the two key pediatric records he interprets. At 15 months, he says, because there was no, I think the respondent argues, doesn't have the word assessment, that it's not a developmental assessment. Because three to six words were checked and not some other things. That somehow shows a developmental delay. It doesn't. It simply does not support it. So you can't bring in an expert with superior credentials who reads into a record something that's there by the force, that he's arguing by the force of his credentials. I think the phrase, I don't speak Latin, but it would be Ipsy Dixit. He just said it. That doesn't make it so. It's not in the record. And that would be the heart of our arbitrary and capricious argument, which is, of course, separate from the constitutional argument, and I believe respectfully has a great deal of force in this case. Okay. I'll give you four minutes for your rebuttal. Thank you. If the government needs an additional four, we'll allow that. Let's start with the standard overview issue. I mean, we do have a situation in which there is a huge amount of power invested in these special masters, most of whom do not have medical backgrounds. And they're making medical determinations. Shouldn't there be some mechanism for a full review of those factual determinations? I don't believe so. I believe it was the intent of Congress in creating this particular forum to bring these vaccine cases to enable these special masters to work exclusively on these particular cases and to develop an expertise in dealing with them routinely and seeing these cases and dealing with, if not the same issue time and again, similar issues, similar causation issues. And I believe this court has recognized that that expertise is worthy of deference, great deference, particularly in a case like this where only factual and credibility issues have been raised on appeal. That's why I believe the chief judge below correctly applied the arbitrary and capricious standard and affirmed the decision of the special master, because the special master, according to this case law, clearly considered the relevant facts, drew plausible inferences, and provided a rational basis to justify his decision. Do you agree that before Brusiewicz it was understood that there was the ability to resort to an Article III court if you wanted to reject the judgment of the special master or even to avoid filing with the vaccine court? Yeah, I believe there has been that opportunity, and I believe that Brusiewicz does not foreclose petitioners from all possible avenues of bringing an Article III claim. But pretty much. A design defect claim is precluded, it seems, by the Brusiewicz court, although in referring to the Stern and Marshall court, it's unclear. I don't think it has been fleshed out whether those design defect claims are really the stuff of litigation brought before the courts of Westminster in 1789 so that it would constitute a common law claim that can be removed from the judicial cognizance. I don't believe that in petitioners' briefing that that issue is fully laid out, an issue that this court is recognizing has great gravity. It would implicate not only just the vaccine program, but also other similar programs that have been in place for years and years. So the implications of that argument are great, and simply on the bare-bones arguments put forth in the briefing here. I don't think that that kind of decision can be undertaken lightly. All right, well, assuming we've got to review this for arbitrary and capricious, there's a couple problems I had with the special master's determinations, like, for one, calling Dr. McToll's position litigation-driven, even though he wasn't being paid for it, and yet not considering the fact that the government's expert was, in fact, a paid expert, who by definition is coming up with a litigation-driven result. Why is one person's expert litigation-driven despite not being hired for the litigation and the other one's not? First and foremost, I would indicate that in reviewing a case on arbitrary and capricious grounds, we're simply looking for any rational basis provided by the special master to justify his decision. And this special master issued a 38-page thorough decision in which he provided numerous justifications. So Dr. McToll's points made in his letter and in his initial report are just a part of that justification. There are other distinct justifications that satisfy the arbitrary and capricious standard. But to get to your point, I believe that what he was referring to as far as litigation-driven is that Dr. McToll's alleged clarification letter was issued some 16 years after his initial consultation that he was referring to in this clarification letter. That amount of time simply weighs against the credibility of that statement. Do you think a doctor can't remember one of the saddest cases that he's had to ever experience? I mean, he wants to see healthy children. This was not a healthy child. Absolutely. However, if you take the definition offered by Dr. McToll in this clarification letter that long-standing simply means that it existed pre-examination, then firstly, that does not contradict Dr. Korman, respondent's expert's theory of the case. He simply says, I don't know when the symptoms started, not the symptoms only started after the vaccine. He's just saying, I don't know. Therefore, the other records can stand on their own. But additionally, if you take that definition of long-standing to mean simply existing prior to examination, then the acute symptoms of limping that he noticed or noted would also be long-standing symptoms of limping because those existed pre-examination as well. So that definition renders the record illegible, incoherent. That's a point that was made by the special master and is another point that weighs against- How do you respond to the Court of Federal Claims' view that there was really no support for this notion, that these problems existed before the MMR? I think that one of the distinct points made by the Chief Judge was that very point, but I think that that weighs against petitioner's claim because respondent is not primarily relying on those pre-vaccination records. Those pre-vaccination records are very short, very vague, and do not demonstrate that any developmental assessment was thoroughly undertaken. That is the point that the Chief Judge made, in fact. There was one small, rather ancillary point that Dr. Korman was relying on in those pre-vaccination records, but that's what petitioner's whole case hinges on. The Chief Judge said, we can't use those records. The whole thing we're looking at here is who had the burden of proof. In other words, the question that we have is, should the burden have shifted to the government to disprove? And if, in fact, as you can see, perhaps the Chief Judge was right, that there was no evidence that it pre-existed, the MMR, why shouldn't the burden have shifted to the government to disprove the connection between the MMR and the illness? The Special Master and the Chief Judge neither found that the burden had shifted because the initial burden is on the petitioners to demonstrate by preponderance of the evidence that the MMR vaccine caused A.M.'s condition. The petitioners did not meet that burden. Without meeting that burden, the burden never shifts back, or never shifts in the first place. That burden is there as a matter of law. Yes. And so long as that has not been satisfied, there's no burden shifting. Neither judge below found that there was any burden shifting. But the other problem I have with the Special Master's conclusion, and this I see all the time, the Special Masters say, well, you know, this is not a good diagnosis because it was partially based on the fact that nobody could figure out what caused this. Isn't that what differential diagnosis is all about? That you go in, and one of the first things you do is see, okay, you've got these conditions. Let's see if we can figure out what caused it. And if you can't, then if you've got a mechanism that could have been the cause, that that's where a professional would normally look. Yes, in general I agree with that. But the evidence presented here demonstrates that there's no clear evidence that the MMR vaccine played a role at all. So there were differential diagnoses, but those diagnoses, those doctors did not actually get into what was the cause. They were looking at the diagnosis of the problem. Well, all they can get into is a most likely cause. I mean, there's lots of illnesses out there. We don't know what caused them. They are, particularly an infection that the AM suffered here, which was closer temporally in relation to the onset of limping than the vaccine. And the vaccine, the MMR vaccine is attenuated for the purpose that it won't get into the central nervous system, so therefore it typically does not cause any problems. But there is an established connection between the MMR vaccine and these motor problems. It is possible, although the Rantala article that was submitted by petitioners showed that there is actually no causation there. And the special master did find that Altham Prong 1 was satisfied, but basically because Dr. Korman said, I think it is possible that there could be, in some circumstance, the MMR vaccine causing a neurological problem. But Altham Prong 1 really shouldn't be satisfied if the only theory is that there's a possibility. But in any event, the infection was also a potential cause here as well. And the burden is really on the petitioner here to prove by preponderance of the evidence that it is the MMR vaccine. And that just simply hasn't been the case. The reason why that's not the case is because that's just not borne out by the evidence. Because there's a seven-day gap or something between when you think it should have been kicked in and when it did? No, because of a litany of other support. Dr. May tell us the conclusion that this was long-standing because of Dr. Malinowska's evaluation in which she determined that A.M.'s skills in numerous developmental categories are significantly delayed. Yet the parents did not note any cognitive regression. Therefore, you couldn't have Dr. Malinowska's findings without a delay predating the vaccine. So a parent with a first child should know exactly how much they can speak at age four and not realize that maybe they're really only at a three-year-old level? Not exactly, but I don't think that's what was asked by the doctors either. These doctors who routinely treat patients, three different doctors noted, both before and after Dr. Malinowska's examination, that the parents expressly noted that they did not notice any cognitive regression. The cognitive regression that would be necessary here in order to, if A.M. was normal on the day of vaccine, but only ten months later he had regressed to the two-and-a-half-year level in certain developmental categories, there would be a significant cognitive regression. And certainly parents who at this point, or at that point in the process, their ears had perked up to a potential problem here with their child, they certainly would have noticed some kind of regression. But that's assuming that they would have understood where he was supposed to be. I mean, every child is different, right? True, that's very true. I had two children. One was speaking 400-word vocabulary at 14 months but didn't walk until she was two, and the other did the opposite, walked at seven and didn't talk until they were two. But here we're talking about regression, so being at a certain point and then going backward. So it's not just developing at a different rate. It's going backward. That's why regression is used. But again, I will remind you that that's just one of the justifications offered by the special master here. He had a 38-page opinion that was very thorough, that considered all the relevant facts, drew plausible inferences, and provided a rational basis. And therefore, the chief judge below found she had to affirm, and that's why respondent here requests that this court both affirm the special master and the chief judge below. Anything further? Okay. All right, thank you. Just a few follow-up points. I'd be happy to answer any additional questions. First of all, prong one's not an issue before this court, even though respondent appears to suggest that petitioners didn't meet it. The burden should have shifted. Our position is we clearly had preponderant evidence showing and meeting the three prongs of Alton, and it should have shifted, and that's when the consideration of sore throat, et cetera, should have been evaluated, and there is clearly insufficient evidence. And we believe respondent has a higher burden at that point to prove that that's the sole cause. We met our burden to show that the vaccine was a substantial cause. But that's the best you could hope for from us is a remand with the burden being shifted, correct, for a reconsideration of the evidence? We certainly would welcome the court's consideration of that issue and then would proceed based on that. I mean, putting aside the Constitution. Well, we would, of course, hope for more, but obviously that outcome would certainly be consistent with our view of the evidence, and we would then proceed from there and believe we could prove our case based on that kind of remand. With respect to Dr. Maytow, in reference to 16 years later, we're talking about treating doctors. So we're talking about three pre-vaccination treating doctors who found no developmental problem, but retrospectively, many years later, an expert comes in and says they don't know what they're doing, and there was a developmental problem, but there's nothing there, and in fact the claims court agreed with that. And then we're talking about... Doesn't just a few words at age two seem a little odd? Well, it was three to six words at 15 months. In fact, as I cited in the brief, the chief special master, in another case, cited Nelson's Pediatrics for the proposition that four to six words would be sufficient at 15 months. So clearly it meets the definitions. There's no support for the inference that the response expert drew, and that was accepted by the special master. Whether it's not enough, you know, there are other issues that we raised that we can't answer. The dual language issue, Polish being spoken solely at home, that could have entered into that. We can't resolve those issues. But what we do know, and this goes to the issue of regression, is that there was a post-vaccine onset for the first time of limping, which was a motor problem. And we also know that that got progressively worse after that to the point where Arthur Millick is in a wheelchair and today ambulates only with help in a wheelchair and can't do basic self-care tasks. So to say there's no regression and to focus on language and say that explains the issue, it doesn't. We have to be reminded by the teaching of this court and often that medical science has not fully explained how vaccines affect the human body. That's why we do have a lower burden of proof for petitioners, notwithstanding the review standard of arbitrary and capricious. Petitioners strongly urge a court to consider that we've met that burden and that no matter how many pages the special master wrote, no matter how much, and with all due respect to the special master, and I have absolute respect for all of them, but no matter how tortured the analysis, that cannot replace the evidence, which is the contemporaneous pediatric record. That's what we must rely on. And here it was disregarded. Here we took retrospective analysis. We took six months post-onset analyses by a psychologist. The other treating doctors, all pediatric neurologists, didn't view it that way. In fact, one of them said to the special master that he believed it was more likely than not, it was more than 50% that the MMR vaccine caused this problem. That all was disregarded. The treating doctors were disregarded, and deference was paid, and I would submit primarily relying on credentials alone. And I also would say that the individual with those credentials invented a retrospective analysis that's just not there. And we, based on that, respectfully ask the court to remand this case for further considerations in light of a finding that the petitioners have met their burden. And I'd be happy to answer any additional questions. Thank you. Thank you. All right, the last case is one that will be submitted and that the court will determine on the briefs. That's Everyday MD, LLC v. Facebook, Inc. And with that, the cases will be submitted.